Stephen YOUNG and Kimberly Young, Appellants

v.

Lenora FAWCETT, Appellee.

No. 09–11–00391–CV.

Court of Appeals of Texas, Beaumont.

Submitted Jan. 31, 2012.

Decided July 26, 2012.

---

Robert E. Price, Houston, for appellants.

Bruce Gregory, Gregory Law Firm, Port Neches, for appellee.

Before McKEITHEN, C.J., GAULTNEY and KREGER, JJ.

## OPINION

DAVID GAULTNEY, Justice.

Kimberly Young and Stephen Young challenge the sufficiency of the evidence to support the jury's finding that a fiduciary relationship existed with Kimberly's grandmother, Lenora Fawcett. The Youngs also challenge the imposition of a constructive trust on their property. We hold that the jury's finding is supported by the evidence, and that a constructive trust is an appropriate remedy under the circumstances. The judgment of the trial court is affirmed.

### THE FACTS

After two strokes, Lenora decided to build her house behind her daughter's house on her daughter's land. Her daughter assured her she could live there the rest of her life. Lenora paid her son-in-law "[e]verything I had, $40,000" to build the house. He assured her the house would be nice, because when Lenora died the house would be his.

Lenora testified:

Q. Did you think that they would eventually get the house that you built?

A. I expected that they would outlive me; and—and, if I should go first, naturally the house would be theirs.

Q. So, how long did you intend to live in that house?

A. I intended to live there till the day I died.

Q. Okay. Did anybody say anything to make you believe that would happen?

A. Yes, when I talked to my daughter about building the house.

And I said, "I just want to get a place where I can live. I don't want to go into a nursing home and I just think it

would be good if I could build me a house here and you're right here." And she says, "And we'll always be here." She said, "Don and I love our home, and we will be here."

When Lenora's son-in-law died, her daughter Debbie was unable to pay the mortgage on her own house. Kimberly and her husband Stephen purchased the property, but at a price which the jurors could reasonably infer did not reflect the value of the house Lenora had built on the property. The foreclosure that was avoided was on the daughter's mortgage. Over time, the Youngs spent approximately $35,000 in making improvements to the property.

All parties understood Lenora's house was built with Lenora's money, and she would live there. When Kimberly and Stephen bought the property, the agreement between Lenora and her daughter had been followed: Lenora's house had been built, she had fully paid her son-in-law, and she was living there. *See generally Swinehart v. Stubbeman, McRae, Sealy, Laughlin & Browder, Inc.,* 48 S.W.3d 865, 882–83 (Tex.App.-Houston [14th Dist.] 2001, pet. denied) (partial performance). Lenora indicated she did not remember having any specific discussion about the house with Kimberly and Stephen either around the time they bought the property or shortly thereafter. But the evidence indicates Kimberly and Stephen accepted the arrangement in purchasing the property. *See generally Providian Nat'l Bank v. Ebarb,* 180 S.W.3d 898, 901 (Tex.App.-Beaumont 2005, no pet.) (ratification). Kimberly testified that "when we bought the house, we bought the house to let everybody stay in a house." "We wanted to help [Lenora]. That's why we bought the house, so she could keep staying back there." Lenora paid $150 a month to Kimberly and Stephen for what

Lenora understood were taxes and insurance, although Kimberly and Stephen testified the $150 was to help with utilities.

Kimberly and Lenora were close. Lenora had been involved in Kimberly's life from the day Kimberly was born. After Kimberly was grown, she took Lenora on trips with her. She and Stephen called Lenora "Mom." After the Youngs bought the property, Lenora continued to live in her house for seven more years.

Kimberly and Stephen knew Lenora trusted them to let her live there as she had been doing, and, if they sold the property, to give her money for her house. Lenora indicated the Youngs did not discuss with her a specific dollar amount that they would pay her after the property was sold. But Kimberly testified, "I knew [Lenora] intended it to be $40,000 'cause she had told my mother that.'" Kimberly explained they told Lenora they would help her out, but never told her they would pay her for her house. Kimberly testified they agreed for Lenora "to stay back there and live in that house while we were up there[,]" but there was no agreement she could stay there for life. When Kimberly and Stephen decided to sell the property, they knew that Lenora paid to have her house built and expected to be compensated.

One of the reasons Kimberly and Stephen were able to sell the property at an increased price was the presence of Lenora's house on the property. The purchasers wanted two houses. Lenora's house was valued by the appraisal district as worth $37,162. Lenora presented expert testimony that her house contributed about $27,500 to the sales price the Youngs were able to obtain.

Assurances were made to Lenora. Stephen, in Kimberly's presence, assured Lenora that "[w]e're selling the house, but don't worry because we're gonna give you

some money for your house." Stephen testified:

Q: And you knew that she built her own house there?

A: I knew that she had paid [Lenora's son-in-law] to build the home.

Q: And you knew she intended to live there till she died?

A: Yes.

Q: And until you put the house on the market, you didn't do anything to alter that point of view, did you?

A: No, sir.

Q: For a number of years that you and Kimmie lived there, you let her go on believing that she was gonna have a place to live until she died?

A: Yes.

Q: And she trusted you in that regard?

A: Yes.

The evidence indicated a confidential relationship of trust existed.

After Kimberly and Stephen sold the property for $199,900, Kimberly sent Lenora a letter by certified mail with a $6,000 check enclosed—a check that Kimberly and Stephen never honored. In the letter, Kimberly acknowledged that the amount was less than Lenora expected to receive from the sale, but Kimberly told Lenora that the amount they received for the property (a little over $110,000 net cash) was less than they had expected.

At the time of the sale, Lenora had fractured her knee and was receiving rehabilitation at a medical care facility. The Youngs and other family members packed up her home furnishings and personal belongings and placed them in a rented storage unit until Lenora was able to find another place to live and retrieve her belongings.

Kimberly wrote Lenora this explanation:

Mom,

I apologize for it taking so long we've been out of town for the past month (alot). . . .

I wish that things werent so hard for you it wasn't our intensions on doing this to you. I understand that its been stressful for alot of people. Enclosed is a check that will hopefully get you on your feet. I'm sorry that its not the amount you intended it to be, but we weren't able to sell the house for what we thought we were. I hope there's no hard feelings. This has been a very difficult situation for us and we know its been difficult for you as well. We love & miss you. We would love for you to come visit us one day when you are feeling better.

Love you,

Instead of paying Lenora anything for her house from the sale proceeds, however, Kimberly and Stephen used the money to pay their credit card bills, to pay their car loan, to pay a loan on a trailer house, to buy a truck, and to build a new house on fourteen acres, a property valued at $335,000.

STANDARD OF REVIEW

To address a legal sufficiency challenge, an appellate court reviews the entire record, and credits favorable evidence if reasonable jurors could, and disregards contrary evidence unless reasonable jurors could not. *See City of Keller v. Wilson,* 168 S.W.3d 802, 827 (Tex.2005). We must assume in this case that the jurors decided questions of credibility or conflicting evidence in favor of Lenora if they reasonably could do so. *Id.* at 819–20. The test for legal sufficiency is whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review. *Id.* at 827. If the evidence "would enable reasonable and fair-minded people to differ in their conclusions, then

jurors must be allowed to do so." *Id.* at 822. An appellate court cannot substitute its judgment for that of the trier-of-fact if the evidence falls within the "zone of reasonable disagreement." *Lee v. Hasson,* 286 S.W.3d 1, 13 (Tex.App.-Houston [14th Dist.] 2007, pet. denied) (citing *City of Keller,* 168 S.W.3d at 822). When a court of appeals reviews a jury finding for factual sufficiency, the court considers and weighs all the evidence and concludes that the finding is not supported by factually sufficient evidence only if the finding is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Id.* at 14 (citing *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986)).

### CONFIDENTIAL RELATIONSHIP

Kimberly and Stephen contend that no fiduciary relationship existed, that they never held or administered property owned by Lenora, and that the trial court could not impose a constructive trust in Lenora's favor. The Youngs do not challenge the phrasing of the jury questions or the amount ($37,162) of the damages the jury awarded.

"The term 'fiduciary' refers to a person owing a duty of integrity and fidelity, and 'it applies to any person who occupies a position of peculiar confidence towards another.'" *Hasson,* 286 S.W.3d at 14 (quoting *Kinzbach Tool Co. v. Corbett–Wallace Corp.,* 138 Tex. 565, 160 S.W.2d 509, 512 (1942)). The Supreme Court has explained that the term "contemplates fair dealing and good faith, rather than legal obligation, as the basis of the transaction." *Tex. Bank & Trust Co. v. Moore,* 595 S.W.2d 502, 507 (Tex.1980). A fiduciary duty may arise from an informal relationship "'where one person trusts in and relies upon another, whether the relation is a moral, social, domestic, or purely personal one.'" *Fitz–Gerald v. Hull,* 150 Tex.

39, 237 S.W.2d 256, 261 (1951) (quoting "Sec. 225, 54 Am.Jur., 'Trusts', p. 173."). Specifically, family relationships—where a person trusts in and relies upon a close member of her core family unit—may give rise to a fiduciary duty when equity requires. *See Mills v. Gray,* 147 Tex. 33, 210 S.W.2d 985, 986–89 (1948) (mother-son fiduciary relationship). "When the societal relationship is one of loving family members or close personal friends, the justification for and reasonableness of reposing trust one in the other is readily understandable." Roy Ryden Anderson, *The Wolf at the Campfire: Understanding Confidential Relationships,* 53 SMU L.Rev. 315, 366 (2000).

Courts generally refer to the informal fiduciary relationship as a "confidential relationship." *Associated Indem. Corp. v. CAT Contracting, Inc.,* 964 S.W.2d 276, 287–88 (Tex.1998); *see also Chapman Children's Trust v. Porter & Hedges, L.L.P.,* 32 S.W.3d 429, 439 (Tex. App.-Houston [14th Dist.] 2000, pet. denied). Subjective trust alone is not sufficient to establish a confidential relationship. *Thigpen v. Locke,* 363 S.W.2d 247, 253 (Tex.1962). Because not every relationship involving a high degree of trust and confidence rises to the stature of a formal fiduciary relationship, the law recognizes the existence of confidential relationships in those cases "'in which influence has been acquired and abused, in which confidence has been reposed and betrayed....'" *Tex. Bank & Trust Co.,* 595 S.W.2d at 507 (quoting *Higgins v. Chicago Title & Trust Co.,* 312 Ill. 11, 143 N.E. 482, 484 (1924)).

Whether a confidential relationship exists is "determined from the actualities of the relationship between the persons involved." *Thigpen,* 363 S.W.2d at 253. The question is ordinarily for the jury in a jury trial where the material

facts are disputed. *See Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.*, 823 S.W.2d 591, 594 (Tex.1992). "The problem is one of equity" and the circumstances giving rise to the confidential relationship "are not subject to hard and fast lines." *Tex. Bank & Trust Co.*, 595 S.W.2d at 508. Factors include whether the plaintiff relied on the defendant for support, the plaintiff's advanced age and poor health, and evidence of the plaintiff's trust. *Trostle v. Trostle*, 77 S.W.3d 908, 915 (Tex.App.-Amarillo 2002, no pet.); *see also Hasson*, 286 S.W.3d at 14–16; *Hatton v. Turner*, 622 S.W.2d 450, 458 (Tex.Civ. App.-Tyler 1981, no writ); *Holland v. Lesesne*, 350 S.W.2d 859, 862 (Tex.Civ.App.-San Antonio 1961, writ ref'd n.r.e.). The trust must be justifiable. *See Thigpen*, 363 S.W.2d at 253.

▮ The record contains evidence of objective manifestations of Lenora's confidence and trust in Kimberly and Stephen, the closeness of their long-standing relationship, acquiescence in and support of the housing agreement, and conduct and affirmations that would justify Lenora's trust. Lenora's agreement with her daughter and son-in-law was known to Kimberly and Stephen, and their conduct, promise, tendered check, and letter indicate an agreement. Essentially, the trial court's judgment requires Kimberly and Stephen to honor their promise to give Lenora money for her house when they sold the property.

"[F]iduciary relationships are not lightly created." *Hasson*, 286 S.W.3d at 19. Relatives assist people of advanced years or those who have health problems, and acts of kindness do not ordinarily give rise to fiduciary duties. The extraordinary facts of this case, including Kimberly's letter to Lenora and the Youngs' tender of the dishonored $6,000 check, indicate the parties' recognition of a confidential relationship and the fiduciary duty imposed. The tendered, though dishonored, check indicates Stephen and Kimberly knew that they should pay Lenora from the sale proceeds.

The jury found that a fiduciary relationship existed. Reasonable and fair-minded jurors may differ with an appellate court on that conclusion, but on this record of disputed facts, the "jurors must be allowed to do so." *See City of Keller*, 168 S.W.3d at 822. "Jury trials are essential to our constitutionally provided method for resolving disputes when parties themselves are unable to do so." *In re Columbia Med. Ctr. of Las Colinas*, 290 S.W.3d 204, 211 (Tex.2009). Fair-minded jurors could reasonably conclude that a confidential relationship existed, and that the confidence was betrayed. We cannot say the jury's findings are contrary to the overwhelming weight of the evidence and clearly wrong and unjust. We hold the evidence is legally and factually sufficient to support the jury findings challenged on appeal.

### CONSTRUCTIVE TRUST

▮ The trial court's judgment imposes a constructive trust on the property which Kimberly and Stephen purchased in part with money from the sale of the house Lenora built. A constructive trust is an available remedy imposed to redress wrong or prevent unjust enrichment under the circumstances. *See generally Meadows v. Bierschwale*, 516 S.W.2d 125, 131 (Tex.1974) (constructive trust); *Lesikar v. Rappeport*, 33 S.W.3d 282, 303 (Tex.App.-Texarkana 2000, pet. denied) (A constructive trust is "a device equity uses to right a wrong.").

In *Mills v. Gray*, a mother's property had been conveyed to a son. *Mills*, 210 S.W.2d at 986. The property was sold, and another house was purchased. The mother believed that the second house was to be taken in her name. Instead, the son

took the property in his name. The mother sought at trial to prove the understanding of the parties at the time of the original conveyance to her son. *Id.* at 986–87. The trial court excluded the evidence. In the appeal, the Texas Supreme Court cited authority that "[a] parent and child, grandparent and child, or brother and sister relationship is not intrinsically one of confidence," but under certain circumstances may involve a confidential relationship, the abuse of which gives rise to a constructive trust in accordance with the terms of a promise. *Id.* at 988 (quoting "54 Am.Jur. 178, Sec. 233"). The Court held the evidence should have been admitted in that case because "if the purported agreement and family arrangement had been established as true, a constructive trust would have arisen by reason of the confidential relation between the parties which would not fall within the prohibition of the Statute of Frauds or the Texas Trust Act." *Id.* at 989.

In this case, the jury found a breach of fiduciary duty and determined the amount of damages. We need not decide whether the damage award is reasonable, because the Youngs do not challenge the amount of the damage award or the jury charge on appeal. Because a confidential relationship existed, Kimberly and Stephen had the burden of showing the fairness of the transaction. *See Tex. Bank & Trust Co.,* 595 S.W.2d at 508–09.

▪ A court may impose a constructive trust on property obtained as a result of a breach of fiduciary duty. *Omohundro v. Matthews,* 161 Tex. 367, 341 S.W.2d 401, 404–05 (1960). Under the circumstances, we cannot say the trial court erred in imposing a constructive trust. We overrule appellants' issues and affirm the trial court's judgment.

AFFIRMED.

CHARLES KREGER, Justice, dissenting.

Finding no evidence of a fiduciary relationship, I would reverse and render judgment for appellants.

Texas courts are reluctant to recognize informal fiduciary relationships. *See Schlumberger Tech. Corp. v. Swanson,* 959 S.W.2d 171, 177 (Tex.1997). The law will recognize the existence of these confidential relationships in those cases " 'in which influence has been acquired and abused, in which confidence has been reposed and betrayed.' " *Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.,* 823 S.W.2d 591, 594 (Tex.1992), *superseded by statute on other grounds as noted in Subaru of Am., Inc. v. David McDavid Nissan, Inc.,* 84 S.W.3d 212, 225–26 (Tex.2002) (quoting *Tex. Bank & Trust Co. v. Moore,* 595 S.W.2d 502, 507 (Tex.1980)).

The record supports and majority acknowledges that Fawcett's agreement was with her daughter and son-in-law, not with Kimberly and Stephen Young. The majority further acknowledges that there is no evidence in the record of an agreement between Fawcett and the Youngs when the Youngs purchased the property. "[S]ubjective trust is insufficient to create a fiduciary relationship." *Garcia v. Vera,* 342 S.W.3d 721, 724 (Tex.App.-El Paso 2011, no pet.).

This case should not have been submitted to the jury. When there is no evidence of a confidential relationship, the trial court should have rendered a take nothing judgment instead of imposing a constructive trust. *See Crim Truck & Tractor,* 823 S.W.2d at 594 (explaining that the issue of whether a fiduciary duty exists in the context of an informal relationship becomes a question of law when there is no evidence of a confidential relationship). The Texas Supreme Court has cautioned

that "a constructive trust does not arise on every moral wrong and that it cannot correct every injustice" and "must be used with caution[.]" *Pope v. Garrett,* 147 Tex. 18, 211 S.W.2d 559, 562 (1948) (citation omitted). Because there is no evidence of a fiduciary relationship, I respectfully dissent.